IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHRISTOPHER MORRIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-3489 |
| | § | |
| B.C. OLYMPIAKOS, SFP, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is KAE Olympiakos SFP's Motion to Vacate Default Judgment (Docket Entry No. 18), and Plaintiff's Motion to Strike the Declaration of Christos Stavropoulos (Docket Entry No. 34).  Having considered the motions, responses and additional briefing, the parties' submissions, the procedural history of this case, and the applicable law, the court concludes, for the reasons explained below, that the motion to vacate should be granted and the motion to strike should be denied.

## I.  Procedural Background

This action arises from an agreement between plaintiff, Christopher Morris (Morris), a former NBA basketball player, and Olympiakos, a Greek national basketball club, for Morris to play basketball in Greece.

On August 29, 2003, Morris sued Olympiakos for breach of contract and fraud arising from Olympiakos' alleged failure to pay Morris for his professional basketball services.[1]

On April 21, 2004, Olympiakos was served with a summons and a copy of Plaintiff's Original Complaint pursuant to the Hague Convention.[2]

On August 31, 2004, Morris filed Plaintiff's Request for Entry of and Default Judgment (Docket Entry No. 8) because Olympiakos had been served with a summons and a copy of the complaint but had not filed a responsive pleading or otherwise defended the suit.

On September 1, 2004, the court entered an Order (Docket Entry No. 9) granting Morris' request for entry of default judgment, and a Final Default Judgment (Docket Entry No. 10) in which the court adjudged that Morris "recover from defendant . . . Olympiakos SFP, the sum of $910,000 together with post-judgment interest thereon at the rate of 2.03% per annum."

On September 4, 2009, Morris filed an Acknowledgment of Assignment of Judgment (Docket Entry No. 11), stating that "I hereby transfer and assign all title, rights and interest in the within judgment to the following person: Gary W. Ebert. . ."  In October of 2009 Ebert filed Plaintiff's Application and Memorandum

---

[1]See Plaintiff's Original Complaint, Docket Entry No. 1.

[2]See Exhibit A attached to Plaintiff's Request for Entry Of and Default Judgment, Docket Entry No. 8.

for an Order for Issuance of Writ of Garnishment (Docket Entry No. 13), which the court granted (Docket Entry No. 14).

On November 13, 2009, Olympiakos filed the pending motion to vacate default judgment (Docket Entry No. 18).

## II. **Motion to Strike**

Plaintiff's assignee, Gary W. Ebert, moves to strike the declaration of Christos Stavropoulos on grounds that "it is inadmissable hearsay, and is thus incompetent evidence to support Olympiakos' Rule 60(b)(4) motion."[3]  Ebert argues that

> Stavropoulos has not met the required elements of Fed. R. Evid. 803 such that the records on which he states he relied in making his declaration come within any recognized hearsay exception.  Stavropoulos states clearly that his declaration is premised solely "upon [his] review of the books and records of Olympiakos." Stavropoulos also testified during his recent deposition that none of the information contained in his declaration is based on his own personal knowledge.  Because the information and testimony contained in Stavropoulos' declaration lacks the required foundation to qualify for any hearsay exception, Plaintiff objects to the admission of the declaration and moves the Court to strike Mr. Stavropoulos' declaration in its entirety.[4]

---

[3]Plaintiff's Motion to Strike the Declaration of Christos Stavropoulos, Docket Entry No. 34, p. 1.

[4]Memorandum in Support of Plaintiff's Motion to Strike the Declaration of Christos Stavropoulos, Docket Entry No. 35, p. 2.

-3-

Olympiakos argues in response that Ebert's objections to the Stavropoulos declaration impact the weight the court is to give the declaration but not its admissibility.[5]

## A.    Applicable Law

The Stavropoulos declaration is not inadmissible hearsay if it comes within an exception to the Hearsay Rule.   Federal Rule of Evidence 803(6) provides, in pertinent part, that:

> The following are not excluded by the hearsay rule . . .
>
> . . .
>
> (6)   A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Rule 803(6) "requires that either the custodian of the business records or 'other qualified witness' lay a foundation before the records are admitted." United States Commodity Futures Trading Commission v. Dizona, 594 F.3d 408, 415 (5th Cir. 2010) (quoting United States v. Brown, 553 F.3d 768, 792 (5th Cir. 2008),

---

[5]Reply Memorandum of Law of KAE Olympiakos SFP in Further Support of Its Motion to Vacate Default Judgment and in Opposition to Motion to Strike Declaration, Docket Entry No. 39, p. 13.

-4-

cert. denied, 130 S. Ct. 246 (2009)).   Whether evidence is admissible under Rule 803(6) is "chiefly a matter of trustworthiness."   Mississippi River Grain Elevator, Inc. v. Bartlett & Co., Grain, 659 F.2d 1314, 1319 (5th Cir. 1981).   Since records maintained in the regular conduct of business are generally trustworthy and because such evidence is often necessary, "the business records exception has been construed generously in favor of admissibility."   Conoco Inc. v. Department of Energy, 99 F.3d 387, 391 (Fed. Cir. 1997).   "[T]here is no requirement that the witness who lays the foundation be the author of the record or be able to personally attest to its accuracy."   Dizona, 594 F.3d at 415.   "A qualified witness is one who can explain the record keeping system of the organization and vouch that the requirements of Rule 803(6) are met."   Id.   "[T]he witness need not have personal knowledge of the record keeping practice or the circumstances under which the objected to records were kept."   United States v. Box, 50 F.3d 345, 356 (5th Cir.), cert. denied, 116 S. Ct. 309 (1995).

Federal Rule of Evidence 803(7) governs the "absence of entry in records kept in accordance with the provisions of paragraph (6)."   It provides:

> Evidence that a matter is not included in the memorandum, reports, records, or data compilations, in any form, kept in accordance with the provisions of paragraph (6), to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and

preserved, unless the sources of information or other circumstances indicate lack of trustworthiness.

This rule allows evidence of the nonoccurrence of a matter that would normally be recorded under Rule 803(6).  It is based on the principal that when a duty to record certain matters exists, the non-existence of a record is evidence for the converse proposition, *i.e.*, that the matter about which there is no report did not occur. The only requirement for the use of evidence to prove the non-existence of an act is the laying of a proper foundation.  In order to lay a proper foundation it is not essential that the offering witness be the person who actually recorded the events.   It is sufficient that the witness is able to testify with respect to the way in which the records were made and the fact that they were retained in the regular course of business.  <u>United States v. Jones</u>, 554 F.2d 251, 252 (5th Cir.), <u>cert. denied</u>, 98 S. Ct. 202 (1977).  Since Rule 803(7) is based on Rule 803(6), the testimony of the custodian of the records or qualified witness is required before evidence may be received under Rule 803(7).[6]

---

[6]The Advisory Committee Note to ¶ 7 leaves open the possibility that the absence of evidence from a record is not hearsay at all: "While probably not hearsay as defined in Rule 801, decisions may be found which class the evidence not only as hearsay but also as not within any exception.  In order to set the question at rest in favor of admissibility, it is specifically treated here."  At least one court recently has noted the possibility that "evidence that a record does not exist arguably is not hearsay at all." <u>United States v. Cervantes-Flores</u>, 421 F.3d 825, 832 n. 4 (9th Cir. 2005), <u>cert. denied</u>, 128 S. Ct. 244 (2007).  For present purposes, the court assumes that such evidence is hearsay, but (continued...)

**B.   Application of the Law to the Facts**

Stavropoulos states in his declaration that he is "the general manager of KAE Olympiakos SFP,"[7] and that he made "this declaration based upon [his] review of the books and records of Olympiakos."[8] Ebert contends that the Stavropoulos declaration lacks an appropriate foundation because during his deposition, Stavropoulos stated that he had no first hand knowledge of Olympiakos' relevant activities, that he does not know if the Olympiakos books and records that he reviewed are complete or accurate, that he has never been the custodian of Olympiakos' books and records, and that there is currently no custodian of Olympiakos' books and records.[9]

In response, Olympiakos has submitted a second declaration from Christos Stavropoulos stating that his first declaration was based on his "exhaustive and extensive multi-day search through Olympiakos' books and records, including its general leger, and

---

[6](...continued)
admissible under Rule 803(7).

[7]Declaration of Christos Stavropoulos in Support of Defendant's Motion to Vacate Judgment Under Rule 60(b) of the Federal Rules of Civil Procedure (Stavropoulos Declaration), Exhibit A attached to Memorandum of Law of KAE Olympiakos SFP in Support of Its Motion to Vacate Default Judgment, Docket Entry No. 19, p. 1 ¶ 1.

[8]Id. at ¶ 2.

[9]Memorandum in Support of Plaintiff's Motion to Strike the Declaration of Christos Stavropoulos, Docket Entry No. 35, p. 6 (citing excerpts from the Deposition of Christos Stavropoulos, Exhibit B attached thereto).

thousands upon thousands of documents located in two warehouses in Greece,"[10] and that

> [i]t was Olympiakos' practice to store its business documents in these warehouses. The records in these warehouses were prepared and maintained in the ordinary course of Olympiakos' business. I have no reason to believe that any documents have been removed from the warehouse.[11]

Stavropoulos has demonstrated through his second declaration that the records he reviewed were kept in the regular course of Olympiakos' business. Although Ebert contends that Stavropoulos' second declaration is inadmissible because an affidavit cannot be used to contradict prior statements made in a deposition, the statements in Stavropoulos' second declaration do not contradict the statements in his deposition. Ebert does not cite, and the court has not found, any place in Stavropoulos' deposition where counsel asked or Stavropoulos answered questions regarding his knowledge of Olympiakos' record keeping practices.

Stavropoulos' statement in his second declaration that the records he reviewed in Olympiakos' warehouses were prepared and maintained in the ordinary course of Olympiakos' business satisfies

---

[10]Declaration of Christos Stavropoulos in Further Support of Defendant's Motion to Vacate Judgment Under Rule 60(b) of the Federal Rules of Civil Procedure and in Opposition to Plaintiff's Motion to Strike the Declaration of Christos Stavropoulos (Stavropoulos Supplemental Declaration) attached to Reply Memorandum of Law of KAE Olympiakos SFP in Further Support of Its Motion to Vacate Default Judgment and in Opposition to Motion to Strike Declaration, Docket Entry No. 39, p. 2 ¶ 3.

[11]Id. at ¶ 5.

the requirements of Rule 803(6) that the witness lay a proper foundation. Although Stavropoulos did not know whether the records were complete, the fact that records might be inaccurate and/or incomplete does not make them untrustworthy and, therefore, inadmissible. See Crompton-Richmond Co., Inc. Factors v. Briggs, 560 F.2d 1195, 1202 n.12 (5th Cir. 1977) (arguments based on inaccuracy and incompleteness of business records go to weight not to admissibility). Once a foundation is laid, in the absence of specific and credible evidence of untrustworthiness, the proper approach is to admit the evidence and permit the fact finder to determine the weight to be given the records. Although Rule 803(6) indicates that evidence can be excluded if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness," the court concludes that Stavropoulos' declaration should be considered. See Rosenberg v. Collins, 624 F.2d 659 (5th Cir. 1980) (records prepared before litigation is foreseeable and sufficiently trustworthy to be relied on by the company in conducting its daily affairs are admissible). Accordingly, plaintiff's motion to strike the declaration of Christos Stavropoulos will be denied.

Alternatively, the court concludes that Stavropoulos' declaration is admissible under Rule 807's residual hearsay exception. The residual hearsay exception permits the admission of an out-of-court statement not covered by Rule 803

if the court determines that (A) the statement is offered
as evidence of a material fact; (B) the statement is more
probative on the point for which it is offered than any
other evidence which the proponent can procure through
reasonable efforts; and (C) the general purposes of these
rules and the interests of justice will best be served by
admission of the statement into evidence.

Fed. R. Evid. 807. The residual exception applies only to
statements "not specifically covered by Rule 803." Id. The Fifth
Circuit interprets this phrase to mean that, if a statement is
admissible under one of the hearsay exceptions, that exception
should be relied on instead of the residual exception. See United
States v. Ismoila, 100 F.3d 380, 392-93 (5th Cir. 1996), cert.
denied sub nom Debowale v. United States, 117 S. Ct. 1712 (1997)
(finding credit cardholder statements admissible under residual
exception after determining that statements were inadmissible as
business records); United States v. Hitsman, 604 F.2d 443, 447 (5th
Cir. 1979) (college transcript not admissible as business record
under Rule 803(6) because neither custodian nor qualified witness
available to testify properly admitted under residual exception).

     The court is of course mindful that merely fulfilling the
requirements of the hearsay exceptions outlined in either Rules
803(6) or 803(7) does not establish a dispositive or conclusive
fact; instead, clearing these evidentiary hurdles only permits
introduction of certain testimony in evidence. In weighing all
the evidence on the issue of Olympiakos' contacts with Texas,

Stavropoulos' testimony will be accorded little weight. Stavropoulos was not the custodian of Olympiakos' books and records, and at least prior to the time that this action was filed was not involved in Olympiakos' efforts to recruit players. Moreover, Stavropoulos admits that the books and records he reviewed are not well organized.[12]

## C.   Conclusions

For the reasons explained above, plaintiff's motion to strike the declaration of Christos Stavropoulos will be denied.

## III. <u>Motion to Vacate</u>

Citing Federal Rule of Civil Procedure 60(b)(4), Olympiakos asserts that it is entitled to relief from the default judgment because the judgment is void.[13]  Olympiakos argues that

> [t]he judgment in this case is void because the Court did not have personal jurisdiction over Olympiakos.  As explained fully in its memorandum in support of this motion, Olympiakos had no contacts whatsoever with the State of Texas in connection with its dealings with

_____

[12]Deposition of Christos Stavropoulos, Exhibit B attached to Memorandum in Support of Plaintiff's Motion to Strike the Declaration of Christos Stavropoulos, Docket Entry No. 35, pp. 8-10, 13-15, and 23-25.

[13]KAE Olympiakos SFP's Motion to Vacate Default Judgment (Motion to Vacate), Docket Entry No. 18, pp. 1-2 ¶ 4.

Morris, and the services contracted for were all to be performed in Greece.[14]

## A.   Standard of Review

A Rule 60(b)(4) motion allows a party to receive relief from a final judgment, order, or proceeding if the underlying judgment is void.  The Fifth Circuit has recognized two circumstances in which a judgment may be set aside under Rule 60(b)(4): (1) if the court lacked subject matter or personal jurisdiction; and (2) if the court acted in a manner inconsistent with due process of law. Carter v. Fenner, 136 F.3d 1000, 1006 (5th Cir.), cert. denied, 119 S. Ct. (1998).  The Fifth Circuit has explained that Rule 60(b)(4) "embodies the principle that in federal court, a 'defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds.'" Jackson v. FIE Corp., 302 F.3d 515, 522 (5th Cir. 2002) (quoting Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinea, 102 S. Ct. 2099 (1982)).  "In general, 'whether in personam jurisdiction can be exercised over a defendant is a question of law and subject to de novo review.'" Id.  at 521 (quoting Dickson Marine Inc. v. Panalpina, Inc., 179 F.3d 331, 335 (5th Cir. 1999)).  This is so because "'Rule 60(b)(4) motions leave no margin for consideration of the district

---

[14]Id.

-12-

court's  discretion  as the judgments themselves are by definition
either legal nullities or not.'"  Id. (quoting Carter, 136 F.3d at
1005).

Citing Jackson, 302 F.3d at 520-21, Ebert argues that "the law
of this case is that Olympiakos bears the burden of proving that
the Court lacks jurisdiction to enter a valid judgment against
it."[15]  Ebert explains that

> Olympiakos,  like  [the  Jackson  defendant],  knowingly
> suffered a default judgment to be rendered against it.
> Like [the Jackson defendant], Olympiakos never challenged
> the Court's jurisdiction by appealing the judgment of the
> original action.  Accordingly, under the Fifth Circuit's
> reasoning  in  [Jackson],  the  Court  should  require
> Olympiakos to prove that it was *not* properly subject to
> the Court's jurisdiction before vacating the judgment
> pursuant to Rule 60(b)(4).[16]

Ebert's  argument  is  misplaced  because  the  procedural  posture  in
Jackson differed from the procedural posture here.

In Jackson, the defendant filed a Rule 60(b)(4) motion to
vacate.  The district court,

> [n]oting that the question who bears the burden of proof
> in a Rule 60(b)(4) challenge to personal jurisdiction is
> one that has not been answered for this circuit, . . .
> adopted the view of the Seventh Circuit that once a
> defendant with notice chooses to suffer a default
> judgment, he is the party who thereafter must shoulder

---

[15]Plaintiff's Sur-Reply to Olympiakos' Memorandum of Law in
Further Support of Its Motion to Vacate Default Judgment, Docket
Entry No. 43, p. 4 ¶ 8.

[16]Id.  See also Plaintiff's Memorandum in Opposition to
Defendant's Motion to Vacate Judgment, Docket Entry No. 36, p. 3
(arguing that "Olympiakos carries the burden of proving that the
Court lacks personal jurisdiction over it").

the burden of proving the absence of personal
jurisdiction.

Id. at 520-21.  The defendant appealed the district court's denial
of its Rule 60(b)(4) motion to vacate, but did not challenge the
district court's holding "that the burden of proof shifts to the
defaulting defendant and Rule 60(b)(4) movant."  Id. at 521 n.6.
The Fifth Circuit explained that because the defendant "has not
challenged this ruling on appeal, it is now the law of the case.
It is not yet, however, the law of this circuit, as we do not reach
the issue and need not choose a side in the split of authority on
this question, leaving that for another day."  Id.  Since the issue
of which party bears the burden of proof on Olympiakos' Rule
60(b)(4) motion to vacate has not previously been considered in
this case, the "law of the case" on this issue has yet to be
established.

The parties and the courts differ over who bears the burden of
showing personal jurisdiction or lack thereof in the context of a
Rule 60(b)(4) motion.  Normally, the plaintiff bears the burden of
demonstrating the court's ability to exercise jurisdiction over the
defendant.  See Luv N' Care, Ltd. v. Insta-Mix, Inc., 438 F.3d 465,
469 (5th Cir.), cert. denied, 126 S. Ct. 2968 (2006) ("Where a
defendant challenges personal jurisdiction, the party seeking to
invoke the power of the court bears the burden of proving that
jurisdiction exists.").  However, Rule 60 is silent on this
question, and the case law is unclear on which party bears the

-14-

burden after a default judgment has been entered.   The Second and Seventh Circuits have placed the burden of proof on the defendant. See Bally Export Corp. v. Balicar, Ltd., 804 F.2d 398, 401 (7th Cir. 1986) ("If the defendant, after receiving notice, chooses to let the case go to a default judgment, the defendant must then shoulder the burden of proof when the defendant decides to contest jurisdiction in a post judgment rule 60(b)(4) motion."); Burda Media, Inc. v. Viertel, 417 F.3d 292, 299 (2d Cir. 2005) ("We now hold that on a motion to vacate a default judgment based on improper service of process where the defaulting defendant had actual notice of the original proceeding but delayed in bringing the motion, the defendant bears the burden of proof to establish that the purported service did not occur."). As the Second Circuit explained,

> placing the burden on the defendant reflects "the concerns of comity among the district courts of the United States, the interest in resolving disputes in a single judicial proceeding, the interest of the plaintiff in the choice of forum, and the fear of prejudice against a plaintiff who, owing to delay, might in subsequent collateral proceedings no longer have evidence of personal jurisdiction that existed at the time of the underlying suit."

Burda, 417 F.3d at 299 (quoting Miller v. Jones, 779 F. Supp. 207, 210-11 (D. Conn. 1991)).  Although the Fifth Circuit has yet to rule on this issue, at least one district court in this circuit has held that the burden remains with the plaintiff.

-15-

In <u>Rockwell International Corp. v. KND Corp.</u>, 83 F.R.D. 556 (N.D. Tex. 1979), the court entered a default judgment in favor of the plaintiff, and the defendants filed motions for relief from judgment pursuant to Rule 60(b)(4) claiming that the judgments entered against them were void because the court lacked personal jurisdiction.  The plaintiff argued that the burden of establishing that the earlier judgment issued without personal jurisdiction must fall on the defendants, and that such a showing could be fulfilled only through the presentation of strong and convincing evidence. Observing that "[t]his assignment of the burden, if correct, would reverse the normal placement when a party challenges the existence of in personam jurisdiction through a Rule 12 motion to dismiss," <u>id.</u> at 559 n.1, the court rejected the plaintiff's argument. Citing <u>McNutt v. General Motors Acceptance Corp. of Indiana, Inc.</u>, 56 S. Ct. 780 (1936), the court concluded that "it is the plaintiff who must shoulder the task of showing facts that permit an affirmative jurisdictional finding . . . a burden that may not be shifted." <u>Id.</u>

<u>McNutt</u>, 56 S. Ct. at 780, involved a challenge to the statutory amount in controversy required for the exercise of diversity jurisdiction, but the reasoning underlying the Court's decision is applicable to the exercise of personal jurisdiction being challenged in this case.  There the Supreme Court explained that the plaintiff

-16-

must allege in his pleading the facts essential to show jurisdiction.   If he fails to make the necessary allegations he has no standing.  If he does make them, an inquiry into the existence of jurisdiction is obviously for the purpose of determining whether the facts support his allegations.  In the nature of things, the authorized inquiry is primarily directed to the one who claims that the power of the court should be exerted in his behalf. As he is seeking relief subject to this supervision, it follows that he must carry throughout the litigation the burden of showing that he is properly in the court.  The authority which the statute vests in the court to enforce the limitations of its jurisdiction precludes the idea that jurisdiction may be maintained by mere averment or that the party asserting jurisdiction may be relieved of his burden by any formal procedure. If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof.   And where they are not so challenged the court may  still  insist  that  the  jurisdictional  facts  be established  or  the  case  be  dismissed,  and  for  that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of the evidence. . .

Here, the allegation in the bill of complaint as to jurisdictional amount was traversed by the answer.  The court made no adequate finding upon that issue of fact, and the record contains no evidence to support the allegation of the bill.  There was thus no showing that the District court had jurisdiction and the bill should have been dismissed upon that ground.

56 S. Ct. at 785.

Plaintiff's Original Complaint alleged that "[t]his Court has

personal jurisdiction over Olympiakos because, among other things,

Olympiakos does business in Texas and because the facts giving rise

to the Complaint, including the formation of the contract at issue,

occurred in Texas."[17]  Plaintiff also alleged:

---

[17]Plaintiff's Original Complaint, Docket Entry No. 1, p. 2 ¶ 4.

6.   Olympiakos is a basketball team that competes in one of the Greek leagues.

7.   In 1999, through Morris' agent, Olympiakos contacted and solicited Morris in Texas about playing for the team in the Greek league.

8.   Olympiakos, through Morris' agent, made representations to Morris while he was in Texas about playing basketball in Greece.

9.   Olympiakos forwarded a draft written basketball agreement to Morris while he was in Texas.

10.  A written agreement ("Agreement") between Olympiakos and Morris was subsequently executed on August 31, 1999.  A true and accurate copy of the Agreement is attached hereto as Exhibit "A".

11.  Pursuant to the Agreement, Olympiakos agreed to pay Morris for playing basketball for it in the Greek league.

12.  Based upon Olympiakos' statements and representations, Morris expended significant time and money, and did not pursue other basketball opportunities, in order to travel to Greece to play basketball.

13.  Under the Agreement, Olympiakos also was required to provide Morris with qualified medical assistance for any injuries suffered playing basketball.

14.  Olympiakos breached that provision of the Agreement by not providing such qualified help after Morris suffered an injury.

15.  Olympiakos further breached that Agreement by unilaterally and unlawfully terminating that Agreement without good cause.

16.  Olympiakos has refused to pay Morris the monies he is owed under this Agreement, and has also refused to address the aggravation of Morris' injury which

was caused by the failure to provide qualified medical assistance.[18]

Because Rule 60(b)(4) "embodies the principle that in federal court, a 'defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds,'" Jackson, 302 F.3d at 522 (quoting Insurance Corp. of Ireland, 102 S. Ct. at 2106), and because Olympiakos has challenged plaintiff's allegations of jurisdictional facts in an appropriate manner by filing its Rule 60(b)(4) motion, the plaintiff must now support his allegations of jurisdictional facts with evidence. Accordingly, the court concludes that the plaintiff (or in this case the plaintiff's assignee, Ebert) not the defendant bears the burden of proof on the issue of personal jurisdiction.

**B.   Applicable Law**

Plaintiff's Original Complaint (Docket Entry No. 1) alleges state law claims for breach of contract and fraud, and alleges that the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship and the amount in controversy exceeds $75,000. For claims arising under state law federal courts "'sitting in diversity may assert [personal] jurisdiction if: (1) the state's long-arm statute applies, as

---

[18]Id. at 2-3 ¶¶ 6-16.

interpreted by the state's courts; and (2) if due process is satisfied under the [F]ourteenth [A]mendment to the United States Constitution.'" Johnston v. Multidata Systems International Corp., 523 F.3d 602, 609 (5th Cir. 2008) (quoting Cycles, Ltd. v. W.J. Digby, Inc., 889 F.2d 612, 616 (5th Cir. 1989)).  The Texas long-arm statute authorizes service of process on nonresidents "[i]n an action arising from the nonresident's business in this state." Tex. Civ. Prac. & Rem. Code § 17.043.  The Texas Supreme Court has stated that "the long-arm statute's broad doing-business language allows the statute to 'reach as far as the federal constitutional requirements of due process will allow.'"  Moki Mac River Expeditions v. Drugg, 221 S.W.3d 569, 575 (Tex. 2007) (quoting Guardian Royal Exchange Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991)).  Exercise of personal jurisdiction over a nonresident defendant comports with federal due process guarantees when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"  International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement, 66 S. Ct. 154, 158 (1945) (quoting Milliken v. Meyer, 61 S. Ct. 339, 343 (1940)).  Once a plaintiff satisfies these two requirements a presumption arises that jurisdiction is reasonable, and the burden of proof and persuasion shifts to the defendant

opposing jurisdiction to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King Corp. v. Rudzewicz, 105 S. Ct. 2174, 2185 (1985).

## C.   Undisputed Facts

Citing the declaration of its General Manager, Christos Stavropoulos, Olympiakos argues that the default judgment is void for lack of personal jurisdiction because Olympiakos had no contacts with the State of Texas in connection with Morris. Ebert has not submitted any evidence that contradicts the relevant aspects of Stavropoulos' declaration regarding Olympiakos' general business practices, i.e. that Olympiakos is a corporate entity formed under Greek law, that Olympiakos is one of Greece's national basketball clubs with a principal place of business in Piraeus, Greece, that Olympiakos does not maintain a presence in Texas, and that on June 24, 2009, Olympiakos was acquired by new owners. Nor has Ebert submitted any evidence that contradicts the relevant aspects of Stavropoulos' declaration regarding Olympiakos' contacts with Morris, i.e., that the contract at issue was entered by the parties on August 31, 1999, in Greece, that the contract was negotiated through Morris' agents, Tom McLaughlin and Andy Boutogiannis in Boston, Massachusetts, and Anastassios Delibaltadakis, an associate of McLaughlin's in Greece, and that

the contract was for services to be performed in Greece.[19]
Stavropoulos' statements concerning Olympiakos' general business
practices and contacts with Morris are corroborated by Olympiakos'
written contract with Morris which is attached to Plaintiff's
Original Complaint,[20] and/or Olympiakos' written contract with
Morris' agent, Tom McLaughlin, which is attached to Stavropoulos'
declaration.[21]

---

[19]Memorandum of Law of KAE Olympiakos SFP in Support of Its
Motion to Vacate Default Judgment, Docket Entry No. 19, pp. 3-5
(citing Exhibit A attached thereto, Declaration of Christos
Stavropoulos in Support of Defendant's Motion to vacate Judgment
under Rule 60(b) of the Federal Rules of Civil Procedure
(Stavropoulos Declaration)).

[20]Contract, attached to Plaintiff's Original Complaint, Docket
Entry No. 1 (opening lines show that the contract was executed in
Piraeus, Greece, on August 1, 1999, by Morris and Olympiakos SFP,
a Basketball Company located in Piraeus, Greece; Article 15 shows
that Morris designated Tassios Delibaltadakis, a resident of
Athens, Greece, as his "attorney in fact").

[21]Agreement, attached to Stavropoulos' Declaration attached to
Memorandum of Law of KAE Olympiakos SFP in Support of Its Motion to
Vacate Default, Docket Entry No. 19 (showing that Olympiakos agreed
to negotiate an agreement for Morris to play basketball in Greece
through McLaughlin and Boutogiannis whose company, Best in Sports,
had an account at the Bank of Boston).  See also Affidavit of Tom
McLaughlin attached to Reply Memorandum of Law of KAE Olympiakos
SFP in Further Support of Its Motion to Vacate Default Judgment and
in Opposition to Motion to Strike Declaration, Docket Entry No. 39,
at ¶¶ 2-3 stating that he has at all times been a resident of
Boston, Massachusetts, and that his company, Best in Sports, has
been located in Andover, Massachusetts since 1995).

## D.   **Analysis**

Ebert argues that

> all of the credible evidence establishes that Olympiakos
> did have the necessary requisite contacts with Texas.
> Not only did Olympiakos solicit Christopher Morris . . .,
> a Texas resident, for employment, but Olympiakos also
> solicited other Texas residents for employment during the
> same relevant time period.  Under Section 17.042(3), such
> solicitations of Texas residents for employment, whether
> accomplished inside or outside the state, are acts that
> constitute "doing business," sufficient to confer
> personal jurisdiction over the soliciting person or
> entity.[22]

In support of his argument that Olympiakos' business contacts with

Texas were sufficient for the court to exercise personal

jurisdiction, Ebert submits Morris' declaration and the declaration

of Shawn Respert, another former basketball player.

In his declaration Morris states:

3.   I am a resident and citizen of Texas.  I have been
     a resident of Texas continuously since 1988.  I
     have had a Texas driver's license since 1988.

4.   Prior to signing the contract with Olympiakos, I
     had at least one telephone conversation with
     Olympiakos' general manager at the time, Takis
     Liveratos, in July of 1999.

5.   During that telephone conversation, Liveratos urged
     me to come play for Olympiakos.

6.   Prior to that telephone conversation, I was
     undecided about whether I would go play for
     Olympiakos, but Liveratos convinced me during that
     telephone call.

---

[22]Plaintiff's Memorandum in Opposition to Defendant's Motion
to Vacate Judgment, Docket Entry No. 36, p. 2 ¶ 4.

7.  During that telephone call, I told Liveratos that he had made up my mind and that I would come play for Olympiakos.

8.  Liveratos expressed delight.  He requested that I provide him my address so that Olympiakos could send me something.

9.  Within a day or two, a Federal Express package arrived at my Texas residence, from Olympiakos. That package contained a travel itinerary and airline tickets for me to fly to Italy to play for Olympiakos.

10. Prior to signing the Olympiakos contract on August 31, 1999, I flew from Texas to Italy, using the airline tickets sent directly to me from Olympiakos.

11. I arrived in Italy on August 10, 1999, and participated in a two-week long training camp with Olympiakos prior to signing the Olympiakos contract.

12. Had it not been for the August 1999 telephone call from Liveratos, I **may** not have signed the contract to play for Olympiakos.[23]

In his declaration Respert states:

1.  I am a retired professional basketball player.

2.  During the 1999-2000 basketball season, I played professional basketball for B.C. Olympiakos SFP's ("Olympiakos") basketball team in Greece.

3.  Prior to the 1999-2000 basketball season, I was a resident of Texas, with a home in Houston, Texas.

4.  During 1999, my agent was Carl Poston, of the firm of Poston & Poston.  Carl Poston's office was in Houston, Texas.

---

[23]Declaration of Christopher Morris, Exhibit F attached to Plaintiff's Memorandum in Opposition to Defendant's Motion to Vacate Judgment, Docket Entry No. 36, ¶¶ 3-12 (emphasis added).

-24-

5.   During the summer of 1999, Olympiakos began
     recruiting me to play basketball through my agent
     in Houston, Texas.

6.   As a result of Olympiakos' recruitment of me,
     through Carl Poston in Houston, Texas, I agreed to
     play professional basketball for Olympiakos.

7.   Following Olympiakos' negotiations with Carl
     Poston, Olympiakos forwarded a player contract to
     Carl Poston for me to sign.  After consulting with
     Carl Poston, I signed the Olympiakos player
     contract.

8.   During the entire time that Olympiakos recruited me
     to play basketball for it during the summer of
     1999, both Carl Poston and I were residents of the
     State of Texas.[24]

1.   <u>Texas Long Arm Statute</u>

Citing § 17.042(3) of the Texas Civil Practice and Remedies
Code, plaintiff contends that Olympiakos is subject to personal
jurisdiction because Olympiakos was doing business in Texas when it
directly recruited him for employment because he was a Texas
resident at the time.  Section 17.042 of the Texas Civil Practice
and Remedies Code provides that

     [i]n addition to other acts that may constitute doing
     business, a nonresident does business in this state if
     the nonresident

     . . .

_____

[24]Declaration of Shawn Respert, Exhibit G attached to
Plaintiff's Memorandum in Opposition to Defendant's Motion to
Vacate Judgment, Docket Entry No. 36, ¶¶ 1-8.

(3) recruits Texas residents, directly or through an
intermediary located in this state, for employment inside
or outside this state.

Ebert contends that Morris was directly recruited by Olympiakos to

play basketball in Greece because Morris had

> at least one July 1999 telephone conversation with
> Olympiakos' general manager (at that time), Takis
> Liveratos. During this telephone conversation, Liveratos
> urged Morris to come play basketball for Olympiakos.
> Prior to the telephone conversation with Liveratos,
> Morris was undecided about whether he would go play for
> Olympiakos, but Liveratos convinced Morris to join
> Olympiakos during the course of that telephone
> conversation.[25]

Ebert also contends that while in Texas Morris received from

Olympiakos a travel itinerary and airline tickets to Italy which

Morris used to participate in a two-week training camp with

Olympiakos prior to signing the Olympiakos contract.[26]

The evidence that plaintiff contends establishes Olympiakos

recruited him to play basketball in Greece does not satisfy the

requirements of § 17.042(3) of the Texas Civil Practice and

Remedies Code for doing business **in** Texas.  Morris states that he

spoke with Liveratos on the telephone but does not state that

either he or Liveratos were in Texas when they spoke on the

telephone.  Ebert has not cited and the court has not found any

case in which a single telephone conversation between a foreign

---

[25]Plaintiff's Memorandum in Opposition to Defendant's Motion
to Vacate Judgment, Docket Entry No. 36, 10 ¶ 23.

[26]Id. at 11 ¶ 24.

employer and a Texas resident has been held to constitute doing business in Texas or recruiting a Texas resident for purposes of § 17.042(3) of the Texas Civil Practices and Remedies Code.

Morris states that after he told Liveratos he would play for Olympiakos, Liveratos asked Morris for his address so that Olympiakos could send him something, and that within a day or two, a package arrived at Morris' Texas residence containing a travel itinerary and airline tickets to Europe. Although Morris does not state that he provided Olympiakos his Texas address, Morris does state that he "flew to Italy using the airline tickets sent **directly** to me from Olympiakos."[27] Inferring from this statement that Olympiakos sent the travel itinerary and airline tickets directly to Morris in Texas, the court cannot conclude that Olympiakos' act of sending these items to Morris in Texas constitutes recruiting a Texas resident for purposes of § 17.042(3) of the Texas Civil Practice and Remedies Code. Morris' statement that Liveratos asked him for his address so that Olympiakos could send him something shows that Olympiakos did not know where Morris lived, that Olympiakos was prepared to send the travel itinerary and airline tickets to whatever address Morris provided, and, therefore, that Olympiakos did not purposely or knowingly recruit a Texas resident. Ebert has not cited and the court has not found

---

[27]Declaration of Christopher Morris, Exhibit F attached to Plaintiff's Memorandum in Opposition to Defendant's Motion to Vacate Judgment, Docket Entry No. 36, ¶ 10 (emphasis added).

any case in which sending a package to Texas at the direction of a
Texas resident has been held to constitute doing business or
recruiting a Texas resident under § 17.042(3) of the Texas Civil
Practices and Remedies Code.[28]  Thus, the court concludes that Ebert
has failed to carry his burden of establishing that Olympiakos'
contacts with Morris constitute doing business or recruiting a
Texas resident under § 17.042(3) of the Texas Civil Practice &
Remedies Code.


   2.   <u>Due Process Requirements of the Fourteenth Amendment</u>

   Exercise of personal jurisdiction over a nonresident defendant
comports with federal due process guarantees when the nonresident
defendant has established minimum contacts with the forum state,
and the exercise of jurisdiction "does not offend 'traditional
notions of fair play and substantial justice.'" <u>International Shoe
Co.</u>, 66 S. Ct. at 158 (quoting <u>Milliken</u>, 61 S. Ct. at 343).


      (a)  Minimum Contacts

   In deciding whether sufficient minimum contacts exist to
exercise personal jurisdiction the court is directed to determine
whether "the defendant's conduct and connection with the forum

_____

   [28]Plaintiff's Original Complaint alleges that "Olympiakos
forwarded a draft written basketball agreement to Morris while he
was in Texas," Docket Entry No. 1, p. 2 ¶ 9, but no evidence has
been submitted in support of this allegation.

state are such that he should reasonably anticipate being haled into court there." Worldwide Volkswagen Corp. v. Woodson, 100 S. Ct. 559, 567 (1980). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 78 S. Ct. 1228, 1240 (1958) (citing International Shoe, 66 S. Ct. at 159). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, . . . or of the 'unilateral activity of another party or third person.'" Burger King, 105 S. Ct. at 2183. Moreover, "[j]urisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum state." Id. at 2183-84.

> [W]here the defendant "deliberately" has engaged in significant activities within a State . . . or has created "continuous obligations" between himself and residents of the forum . . . he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

Id. at 2184. "There are two types of 'minimum contacts': those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction." Lewis v. Fresne, 252 F.3d 352, 358 (5th Cir. 2001). Olympiakos contends that its

-29-

contacts with Texas are insufficient to support this court's exercise of personal jurisdiction on the basis of either general or specific jurisdiction.[29]

### (1) General Jurisdiction

A court may exercise general jurisdiction over a non-resident when the non-resident's "contacts with the forum state are substantial, continuous, and systematic." Johnston, 523 F.3d at 609 (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 104 S. Ct. 1868, 1872-74 (1984)). "The 'continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum.'" Id. (quoting Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V., 249 F.3d 413, 419 (5th Cir.), cert. denied, 122 S. Ct. 646 (2001)). "'[E]ven repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous, and systematic contacts required for a finding of general jurisdiction. . .'" Id. (quoting Revell v. Lidov, 317 F.3d 467, 471 (5th Cir. 2002)). "General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." Access Telecom, Inc. v. MCI Telecommunications Corp., 197 F.3d 694,

---

[29]Memorandum of Law of KAE Olympiakos SFP in Support of Its Motion to Vacate Default Judgment, Docket Entry No. 19, pp. 9-13 (specific jurisdiction) & p. 13 n. 5 (general jurisdiction).

717 (5th Cir. 1999), cert. denied, 121 S. Ct. at 275 and 292
(2000). "The determination of what period is reasonable in the
context of each case should be left to the court's discretion."
Metropolitan Life Insurance Co. v. Robertson-Ceco Corp., 84 F.3d
560, 570 (2d Cir.), cert. denied, 117 S. Ct. 508 (1996). For
general jurisdiction purposes, the court does not view each contact
in isolation but, instead, views all the defendant's contacts in
toto. See Access Telecom, 197 F.3 at 717 (when determining whether
a nonresident defendant's contacts with the forum state are
sufficient to establish general personal jurisdiction, contacts
must be examined "in toto" instead of in isolation). "[V]ague and
overgeneralized assertions that give no indication as to the
extent, duration, or frequency of contacts are insufficient to
support general jurisdiction." See Johnston, 523 F.3d at 610
(citing Gardemal v. Westin Hotel Co., 186 F.3d 588, 596 (5th Cir.
1999)).

The seminal general jurisdiction case is Perkins v. Benguet
Consolidated Mining Co., 72 S. Ct. 413 (1952), in which the Supreme
Court first articulated the idea that a court may exercise personal
jurisdiction over a foreign corporation based on general business
operations within the forum state. The Supreme Court upheld the
district court's exercise of general personal jurisdiction in Ohio
over a Philippine corporation whose president and general manager
relocated to Ohio during the Japanese occupation of the Philippine

-31-

Islands.   While in Ohio, the president maintained a corporate office where he kept the records of the corporation, conducted director's meetings, and made all key business decisions.   The corporation also distributed salary checks drawn on two Ohio bank accounts and engaged an Ohio bank to act as a transfer agent.   In light of these activities, the Court held that Ohio could exercise jurisdiction over the corporation because the president had "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company."   Id. at 419.

By contrast, in Helicopteros the Supreme Court held that the defendant's general business contacts with Texas were insufficient to support an exercise of general jurisdiction despite the fact that the defendant had purchased equipment from a company in the forum state.   104 S. Ct. at 1873-74.   Over a six-year period the defendant purchased helicopters (approximately 80% of its fleet), spare parts, and accessories for more than $4 million from a Texas company; sent its prospective pilots to Texas for training; sent management and maintenance personnel to Texas for technical consultations; and received a check for over $5 million that was drawn upon a Texas bank.   Nevertheless, the Court held that none of the contacts were substantial enough standing alone or taken together to support the assertion of general jurisdiction.   The Court explained that the mere purchase of goods from a state, even

at regular intervals and in substantial amounts, was not enough to warrant the assertion of general jurisdiction over a non-resident on a cause of action unrelated to those purchases. Nor was the Court persuaded that the fact that the defendant sent personnel to Texas for training in connection with the purchases enhanced the nature of the contacts. Instead, the Court concluded that this was merely one aspect of the package of goods and services that the defendant had purchased. Finally, the Court concluded that the receipt of a check drawn from a Texas bank was of no consequence because the bank from which payment was made was caused by the fortuitous "unilateral activity" of a third party. Id.

The Fifth Circuit has consistently imposed the high standard set by the Supreme Court in Helicopteros when ruling on general jurisdiction issues. See, e.g., Central Freight Lines Inc. v. APA Transportation Corp., 322 F.3d 376, 381 (5th Cir. 2003) (finding no general jurisdiction even though the defendant routinely arranged and received shipments to and from Texas and regularly sent sales people to Texas to develop business, negotiate contracts, and service national accounts). Moreover, in Access Telecom, 197 F.3d at 717, the Fifth Circuit emphasized that in order to confer general jurisdiction a defendant must have a business presence in Texas. In that case the evidence of the defendant's (i.e. Telmex's) contacts with Texas from 1990 to 1996 were numerous:

> Up until 1990, Telmex leased telephone circuits between
> Arizona and Texas. Telmex's current lines interconnect

-33-

> with Texas at the border in McAllen and El Paso.  Telmex
> leased real property in Texas in 1995 and paid taxes to
> Texas that same year.  Telmex contracted to a warehouse
> 75,000 telephone poles in Laredo around 1990-1991.
> Telmex had correspondent agreements with a number of U.S.
> carriers.   Settlement revenues from these agreements
> totaled approximately $1 billion a year in 1994-1995.
> The total revenues derived from Texas residents totaled
> millions of dollars a month.  Telmex also solicited ads
> for yellow page ads in border cities of U.S., although it
> is unclear exactly where.  Additionally, SBC is alleged
> to be a Texas contact of Telmex, since SBC owns a portion
> of a controlling interest in Telmex and thus exerts some
> control over Telmex.

Id.  In a footnote the Fifth Circuit elaborated that "[a] number of

other contacts are also put forward, mostly involving Telmex paying

for services that were provided by corporations in Texas or the

U.S.  Such services included consulting and finance services."

Id. & n. 6.  The Fifth Circuit rejected the plaintiff's claim that

Telmex's contacts were sufficient to confer general jurisdiction

because "Telmex ha[d] virtually no contacts which constitute doing

business *in* Texas." Id.  The Fifth Circuit explained that

> Primarily, Telmex interconnects its Mexican lines with
> American lines, enabling long distance communication.
> The money U.S. companies pay Telmex is for service on the
> Mexican leg of the call; the money the U.S. carriers
> receive is for the U.S. leg of a call.  As such, Mexican
> and U.S. telecommunications companies do business *with*
> each other in these situations, but neither is doing
> business *in* the other country for jurisdictional
> purposes.
>
> . . .
>
> The one contact that could constitute doing business in
> Texas would be the yellow page ads.  However, the
> evidence on the yellow page ads consists of nothing more
> than a comment that Telmex solicited yellow page ads in
> border cities in the U.S. without naming which cities,

-34-

> when this occurred, whether such ads were actually
> placed, or for how long.  Without more, such evidence
> does not help establish continuous and systematic
> contacts.
>
> . . .
>
> In sum, the totality of the contacts suggests that Telmex
> conducted a great deal of business with Texas, but
> virtually none in Texas, as such general jurisdiction
> cannot be shown, even on a prima facie basis.

Id. at 717-18.

Olympiakos argues that its contacts with Texas are not sufficient to establish general jurisdiction because it "does not (1) reside in Texas, (2) maintain offices in Texas, (3) own, rent or lease real property in Texas, (4) pay taxes in Texas, or (5) maintain any bank accounts in Texas."[30]  Although plaintiff contends that by recruiting him, Respert, and perhaps other Texas residents to play basketball in Greece, Olympiakos was doing business in Texas, plaintiff has not cited any evidence that Olympiakos has ever had a business presence in Texas.

The facts as stated by Morris and Respert in their declarations show that in 1999 Olympiakos recruited them both to play basketball in Greece by contacting Morris once by telephone, and by contacting Morris' Massachusetts-based agents and Respert's Texas-based agent more than once.  Plaintiff has not cited and the court has not found any case in which a court has recognized the recruitment of state residents for out-of-state employment to

---

[30]Id. at 13 n. 5.

constitute substantial, systematic, and continuous contacts with a forum state needed to subject a foreign defendant to the court's general jurisdiction. See Clark v. Moran Towing & Transportation Co., Inc., 738 F. Supp. 1023, 1028 (E.D. La. 1990) ("Moran Towing and Transportation Company certainly has not submitted to this court's general jurisdiction based simply on its recruitment activities in Louisiana from December of 1988 through March of 1989"); Casas v. Northrop Grumman Ship Systems, Inc., 533 F. Supp.2d 707, 713 (S.D. Tex. 2008) ("the Court cannot find that a single recruitment effort spurred by a natural disaster evinces continuous, systematic, or substantial contacts with Texas sufficient to establish general jurisdiction"). Because plaintiff has failed to cite any evidence showing that Olympiakos' contacts with Texas have ever been so substantial, systematic, or continuous that Olympiakos "should have reasonably expected to be sued in Texas on any matter, however remote from [those] contacts," Johnston, 523 F.3d at 613, the court concludes that the exercise of general jurisdiction over Olympiakos would not comport with the due process guarantees of the Fourteenth Amendment.

### (2)  Specific Jurisdiction

A court may exercise specific jurisdiction over a nonresident defendant if "the defendant's contacts with Texas 'arise from, or are directly related to, the cause action.'" Lewis, 252 F.3d at

-36-

358 (quoting <u>Wilson v. Belin</u>, 20 F.3d 644, 647 (5th Cir.), <u>cert.</u>
<u>denied</u>, 115 S. Ct. 322 (1994)).  The Fifth Circuit has articulated

> a three-step analysis for specific jurisdiction:
> "(1) whether the defendant has minimum contacts with the
> forum state, *i.e.*, whether it purposely directed its
> activities toward the forum state or purposefully availed
> itself of the privileges of conducting activities there;
> (2) whether the plaintiff's cause of action arises out of
> or results from the defendant's forum-related contacts;
> and (3) whether the exercise of personal jurisdiction is
> fair and reasonable."

<u>McFadin v. Gerber</u>, 587 F.3d 753, 759 (5th Cir. 2009), <u>pet. for</u>
<u>cert. filed</u> 78 U.S.L.W. 3531 (March 3, 2010)(No. 09-1067) (quoting
<u>Seiferth v. Helicopteros Atuneros, Inc.</u>, 472 F.3d 266, 271 (5th
Cir. 2006)).  The minimum contacts inquiry is fact intensive and no
one element is decisive; rather the touchstone is whether the
"defendant's conduct and connection with the forum State are such
that [it] should reasonably anticipate being haled into court
there." <u>World Wide Volkswagen</u>, 100 S. Ct. at 567.


(I)  Purposeful Availment

Asserting that Morris is a resident of Texas, Ebert argues
that because Olympiakos recruited Morris for employment, Olympiakos
is subject to personal jurisdiction in Texas under the Texas Long
Arm statute because Olympiakos was doing business in Texas.  Ebert
cites <u>Garcia v. Vasquez</u>, 524 F. Supp. 40 (S.D. Tex. 1981), as a

case in which "this Court faced this very issue and concluded that it had personal jurisdiction over the defendant."[31]

In Garcia, 524 F. Supp. at 40, a North Carolina employer submitted a request for migrant farm workers to the national farm worker clearance system that was transmitted to the Texas Employment Commission (TEC). A number of migrant workers who were Texas residents responded to the request by telephoning the TEC in Harlingen, Texas, from Minnesota. During the telephone call the TEC communicated the terms of the employment including the wages, hours, and availability of housing. A number of the migrant workers agreed to the terms of employment, but when they arrived in North Carolina, they discovered that the wages, hours, and availability of housing were not as promised. After the migrant workers filed suit in Texas, the North Carolina farmer raised the issue of personal jurisdiction under the Due Process clause. Even though the North Carolina employer had no regular place of business or designated agent in Texas, the court rejected the employer's argument stating that the

> [d]ue process requirements are . . . fulfilled. Defendant . . . purposefully issued the job information in North Carolina. The T.E.C. officials merely acted on his behalf in processing the information. The privilege of conducting activities in Texas was intentionally invoked by [defendant]. This cause of action plainly arises from and is connected with the alleged Texas transaction.

---

[31]Plaintiff's Memorandum in Opposition to Defendant's Motion to Vacate Judgment, Docket Entry No. 36, 12.

Id. at 42.   Garcia stands for the principal that a nonresident farmer who recruits Texas laborers to work in another state, either directly or through an agent located in Texas, is subject to the jurisdiction of Texas courts for claims arising from that recruitment.   See Neizil v. Williams, 543 F. Supp. 899, 903-04 (D.C. Fla. 1989) (citing Garcia in support of its holding that the defendant "affirmatively established minimum contacts with the state of Florida by conducting recruitment efforts in Florida by causing the transmittal of a clearance order to the Florida State Employment Service and specifying that a Florida farm labor contractor conduct recruiting and hiring on its behalf").

Garcia, 524 F. Supp. at 40, is distinguishable from this case because there the request for laborers was not only communicated to and distributed by the Texas-based TEC, but the plaintiffs spoke by telephone to the TEC in Texas, and during that telephone conversation the TEC communicated to the plaintiffs the terms and conditions of employment pursuant to which the plaintiffs agreed to work in North Carolina.   Moreover, the claims that the plaintiffs asserted in the lawsuit were claims for breach of the terms and conditions of employment that the TEC communicated to them during their telephone call to Texas.   Here, there is no evidence that Olympiakos used any Texas-based entity to recruit Morris to work in Greece.   Ebert contends that Olympiakos' then general manager, Liveratos, spoke directly to Morris by telephone but Ebert has not

-39-

cited any evidence showing that either Morris or Liveratos was in Texas during that telephone conversation.   Ebert contends that after Morris told Liveratos that he would play basketball for Olympiakos, Liveratos asked Morris for his address so that Olympiakos could send something to him and that within days Morris received from Olympiakos, at his Texas residence, an itinerary and airline tickets to Europe.   But Ebert has not cited any evidence showing that before Morris spoke on the telephone with Liveratos and agreed to play basketball for Olympiakos, *i.e.*, when Olympiakos recruited Morris through Morris' Massachusetts-based agents, that Olympiakos knew or had reason to know that it was recruiting a Texas resident.

The facts of this case are also distinguishable from other recruitment cases in which courts have found that the exercise of specific jurisdiction comports with the requirements of due process. For example, in <u>Runnels v. TMSI Contractors, Inc.</u>, 764 F.2d 417 (5th Cir. 1985), a Saudi Arabian limited partnership recruited the plaintiff, a Louisiana resident, to come to work for it in Saudi Arabia.   The partnership had placed job advertisements in two Louisiana newspapers for approximately five years, and its resident agent in California had mailed sample and actual contracts to the plaintiff at his home in Louisiana.   The plaintiff took the job and worked in Saudi Arabia for over a year before he was fired. The plaintiff brought sit in Louisiana for wrongful discharge.   In

-40-

concluding that the Louisiana court could exercise personal jurisdiction over the Saudi Arabian partnership, the Fifth Circuit stated:

> Because TMSI Arabia solicited Louisiana residents through local advertising and through its agent, because its contacts with Louisiana were deliberate rather than fortuitous, and because it could reasonably foresee that contract disputes would likely arise as a result of its solicitation of United States citizens, it is not unfair to require that TMSI Arabia defend this suit in Louisiana.

764 F.2d at 423. See also Clark, 738 F. Supp. at 1029-30 (holding that court could exercise specific jurisdiction over nonresident entity that purposefully directed its recruitment activities towards the state by advertising in local newspaper and conducting interviews in the state); Dotson v. Fluor Corp., 492 F. Supp. 313, 314-317 (W.D. Tex. 1980) (holding that the defendant purposefully availed itself by using an agent authorized to do business in Texas to recruit Texas employees to work overseas by placing advertisements in a Texas newspaper); Gonzalez Moreno v. Milk Train, Inc., 182 F. Supp.2d 590, 594 (W.D. Tex. 2002) (finding jurisdiction where defendant contacted a farm labor service to recruit Texas residents for migrant farm employment in New York, provided the farm labor service with the terms and conditions of employment, paid the farm labor service a fee for each migrant worker provided, hired plaintiffs as a result of the farm labor service's recruitment in Texas, paid plaintiffs bus fare to New York, and plaintiffs signed their employment contracts in Texas).

For the reasons explained above, the court concludes that there is no evidence from which the court can reasonably conclude or even infer that when Olympiakos recruited Morris to play basketball in Greece, Olympiakos knew or had reason to know that Morris was a Texas resident such that Olympiakos purposefully availed itself of the privilege of doing business in Texas could reasonably anticipate being haled into court there. Moreover, even if the evidence were sufficient to establish that by recruiting Morris to play basketball in Greece, Olympiakos purposefully availed itself of the privilege of doing business in Texas, the evidence would still not be sufficient for the court to exercise personal jurisdiction over Olympiakos because the evidence does not meet the requirement that the claims asserted in this action arise from or be connected with that act of recruitment. See Van Pelt v. Best Workover, 798 S.W.2d 14, 16 (Tex.App. El Paso, 1990, no writ) ("The recruitment in Texas is not alone sufficient.  The cause of action must arise from or be connected with that act of recruitment.").

### (ii) Claims Arising from Forum Contacts

Even if Olympiakos directly recruited Morris in Texas, the court may not exercise personal jurisdiction over Olympiakos unless the claims in this action arise out of or result from that act of recruitment. Van Pelt, 798 S.W.2d at 16.  Because Ebert has not

-42-

presented any evidence showing that the breach of contract and/or
fraud claims alleged in this action arise out of or result from
either the telephone call during which Morris spoke with Liveratos,
or from the travel itinerary and airline tickets that Morris
received from Olympiakos at his Texas residence, the court has no
reason to conclude that the exercise of specific jurisdiction over
Olympiakos satisfies the due process requirements of the Fourteenth
Amendment.

### (A)   Breach of Contract

Plaintiff alleges:

18.  On August 31, 1999, Morris and Olympiakos entered
into a written Agreement.

19.  Pursuant to the Agreement, Olympiakos was to provide
qualified medical assistance for Morris as well as to pay
Morris for his basketball services.

20.  Olympiakos has breached the Agreement by failing to
pay Morris and by failing to provid[e] qualified medical
assistance to Morris.

21.  As a direct and proximate result of Olympiakos'
breach of the written Agreement as described above,
Morris has been damaged in an amount in excess of
$1,000,000.00, exclusive of interest, costs, and
attorney's fees.[32]

Olympiakos contends, and Ebert does not dispute, that the written
contract the parties entered on August 31, 1999, was executed by

---

[32]Plaintiff's Original Complaint, Docket Entry No. 1, p. 3
¶¶ 18-21.

-43-

the parties in Greece.[33]   While Morris states in his declaration
that "[h]ad it not been for the [July] 1999 telephone call from
Liveratos, I **may** not have signed the contract to play for
Olympiakos,"[34] Morris neither alleges nor argues that his breach of
contract claim is for breach of an employment contract made during
his telephone conversation with Liveratos.   Instead, the factual
allegations contained in Plaintiff's Original Complaint show that
the contacts that Olympiakos had with Morris in Texas were merely
negotiations leading up to contract formation and that the breaches
alleged in this action did not arise from and were not connected to
Olympiakos' contacts with Morris in Texas but, instead, from
Olympiakos' alleged failure to provide medical assistance for
injuries that Morris suffered while playing basketball in Greece
and from Olympiakos' unilateral termination of the contract without
good cause in Greece.[35]

Morris' allegations establish that the breaches for which he
sought relief are breaches of a contract that was executed in
Greece over a month after he talked to Liveratos on the telephone

---

[33]See Contract, Exhibit A attached to Plaintiff's Original
Complaint, Docket Entry No. 1, (stating "In Piraeus, August 31,
1999 the undersigned: . . .").

[34]Declaration of Christopher Morris, Exhibit F attached to
Plaintiff's Memorandum in Opposition to Defendant's Motion to
Vacate Judgment, Docket Entry No. 36, p. 2 ¶ 12.

[35]Plaintiff's Original Complaint, Docket Entry No. 1, pp. 2-3
¶¶ 13-16.

-44-

and received the travel itinerary and airline tickets in Texas, and that the acts Morris alleges constitute breaches occurred in Greece not in Texas.  Because neither evidence nor argument has been presented that links the breaches for which Morris sought relief to the telephone conversation that he had with Liveratos or to the travel itinerary and/or airline tickets that he received in Texas, the court concludes that the breach of contract claims alleged in this action do not arise from and are not connected to Olympiakos' contacts with Texas.

The breach of contract claims at issue in this case are distinguishable from the claims at issue in Garcia, 524 F. Supp. at 40, because the breaches at issue there arose from promises made during a telephone call to Texas in which the migrant farm worker plaintiffs were recruited to work in North Carolina.  Here, plaintiff has neither alleged nor presented any evidence showing that the breaches at issue arose from promises or representations that Liveratos made to Morris during their telephone conversation, or from promises or representations that were made in any of the documents delivered to Morris in Texas.  The facts of this case are analogous to those of Van Pelt, 798 S.W.2d at 14, in which the court held that when the defendant's only contacts with Texas involve recruitment activities, courts may exercise specific jurisdiction only if the plaintiff's cause of action stems from that act of recruitment.  Id. at 16.

-45-

Merely contracting with a resident of the forum state does not sufficiently support the exercise of jurisdiction over a defendant. Icee Distributors, Inc. v. J&J Snack Foods Corp., 325 F.3d 586, 591 (5th Cir. 2003).   The Fifth Circuit has consistently looked to other factors surrounding the contract and its formation including, primarily, the place of performance and/or intended performance, and the place of subsequent breach.   Id. at 591-92.   See also Religious Technology Center v. Liebreich, 339 F.3d 369, 375 (5th Cir. 2003), cert. denied, 124 S. Ct. 1085 (2004) ("In the specific jurisdiction rubric, only those acts which relate to the formation of the contract and the subsequent breach are relevant."); Jones v. Petty-Ray Geophysical Geosource, Inc., 954 F.2d 1061, 1068 (5th Cir.), cert. denied, 113 S. Ct. 193 (1992) ("In contract cases, this Court has consistently looked to the place of contractual performance to determine whether the making of a contract with a Texas resident is sufficiently purposeful to satisfy minimum contacts."); Barnstone v. Congregation Am Echad, 574 F.2d 286, 288 (5th Cir. 1978) ("[I]t is the place of performance rather than execution, consummation or delivery which should govern the determination of [personal] jurisdiction."); Kervin v. Red River Ski Area, Inc., 711 F. Supp. 1383, 1389-90 (E.D. Tex. 1989) ("In personam jurisprudence has taken a restrictive view of the relationship between causes of action and contacts, seemingly to

require virtually a direct link between claim and contacts in order to pursue a specific jurisdiction analysis.").

Undisputed facts now before the court establish that even if Morris was in Texas during the telephone conversation with Liveratos, both parties always intended for Morris to play basketball in Greece, Morris moved to Greece to play basketball for Olympiakos, the contract at issue was formed in Greece, the breaches alleged in this action all occurred in Greece, and none of the acts for which Morris seeks compensation occurred in Texas. These undisputed facts establish that the breach of contract claims alleged in this action do not arise from and are not connected to Olumpiakos' contacts with Texas.

(B)   Fraud

Plaintiff alleges:

22.   Morris maintains that Olympiakos intentionally made false representations of material fact regarding its obligations and promises **under the written Agreement between the parties.**

23.   Morris maintains that Olympiakos intentionally made false representations of material fact to him regarding its obligations and promises **under the written Agreement between the parties.**

24.   Morris maintains that he reasonably relied on these misrepresentations, to his detriment.  In particular, Morris states that, **based on the misrepresentations of Olympiakos, he entered into a written Agreement** and fully performed his obligations under the Agreement, including the expenditure of time and money in providing his professional services to Olympiakos.

-47-

25.  Morris maintains that the false representations made by Olympiakos were:

a)  made as to facts susceptible of actual knowledge, with knowledge of their untruth or with reckless disregard of same;

b)  promissory in nature, but made with a present intent not to comply therewith; and/or

c)  made in breach of Olympiakos' duty to exercise due care to reasonably determine that the representations made were true and accurate at the time made and that true and accurate statements were made to Morris.

26.  Morris further maintains that Olympiakos made false, fraudulent, and/or malicious representations to him to induce him to execute the Agreement, and to perform his professional services.

27.  As a direct and proximate result of Olympiakos' intentional misrepresentations, Morris ha[s] been damage[d] in an amount in excess of $1,000,000.00, exclusive of interest, costs, and reasonable attorney's fees.[36]

The Fifth Circuit has held that "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment.  The defendant is purposefully availing himself of 'the privilege of causing a consequence' in Texas.'"  Wein Air Alaska, Inc. v. Brandt, 195 F.3d 208, 213 (5th Cir. 1999).  See also Brown v. Flowers Industries Inc., 688 F.2d 328, 332-34 (5th Cir. 1982), cert. denied, 103 S. Ct. 1275 (1983) (holding that a single defamatory phone call directed at a forum was sufficient to support

_____

[36]Id. at 3-4 ¶¶ 22-27.

-48-

exercise of personal jurisdiction); D.J. Investments v. Metzeler Motorcycle Tire Agent Gregg, Inc., 754 F.2d 542, 546-48 (5th Cir. 1985)(In a claim for tortious misrepresentation, the "minimum contacts" test allowing long-arm jurisdiction is satisfied when the misrepresentation occurred, in whole or in part, in Texas.).

Morris did not allege and Ebert does not argue that the misrepresentations on which the fraud claims asserted in this action are based were made during the single telephone conversation that Morris had with Liveratos. Instead, the factual allegations contained in Plaintiff's Original Complaint show that the misrepresentations at issue were made in the written agreement that the parties undisputedly entered in Greece in August of 1999 over a month after Morris spoke to Liveratos on the telephone. The undisputed facts of this case are distinguishable from the facts of Garcia, 524 F. Supp. at 40, where the claims at issue arose from promises made during a telephone call to Texas in which the migrant farm worker plaintiffs were recruited to work in North Carolina, and are analogous to those of Van Pelt, 798 S.W.2d at 14, where the court held that when the defendant's only contacts with Texas involve recruitment activities, courts may exercise specific jurisdiction if the plaintiff's cause of action stems from acts of recruitment. Id. at 16. Because Morris has not alleged, and Ebert has not submitted any evidence showing that the misrepresentations for which relief was sought in this action were made in Texas, the

-49-

court concludes that Olympiakos lacks minimum contacts needed to support the court's exercise of personal jurisdiction over it with respect to the fraud claims asserted here since those claims do not arise from and are not connected to Olympiakos' contacts with Texas.

                    (b)   Fair Play and Substantial Justice

     Because the court has already concluded that there is no evidence from which to conclude or even to infer that when Olympiakos recruited Morris to play basketball in Greece, Olympiakos purposefully availed itself of the privilege of doing business in Texas such that Olympiakos could reasonably anticipate being haled into court there, or, that the claims for breach of contract and fraud that Morris alleged arise out of or result from Olympiakos' contacts with Texas, the court need not determine whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice.  See Felch v. Transportes Lar-Mex SA DE CV, 92 F.3d 320, 329 n. 20 (5th Cir. 1996) ("As Felch failed to establish sufficient 'minimum contacts' with Texas, we need not address whether the exercise of personal jurisdiction in this case would offend traditional notions of fair play and substantial justice.").  But even if Morris' claims did arise out of Olympiakos' contacts with Texas, fair  play and

substantial justice would require the court to grant Olympiakos' motion to vacate.

The primary goal of the due process clause as it relates to personal jurisdiction is fairness to foreign defendants.  See Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1999) ("We now know that an essential goal of the test is to protect the defendant.").  In Asahi metal Industries v. Superior Court of California, 107 S. Ct. 1026 (1987), the Court provided several factors that must be considered to determine whether the exercise of personal jurisdiction is reasonable.  A court must consider the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief.  Id.  Undisputed facts establish that any injuries Morris suffered were suffered in Greece not in Texas.  Requiring Olympiakos, a Greek corporation, to defend this suit in Texas when its contacts with Texas were at best — slight — and not related to Morris' causes of action, would not comport with traditional notions of fair play and substantial justice.

**E.   Conclusions**

For the reasons explained above, the court concludes that Olympiakos lacks minimum contacts with Texas needed to support the court's assertion of either specific or general personal jurisdiction, and that requiring Olympiakos, a Greek corporation,

-51-

to defend this suit in Texas would not comport with traditional notions of fair play and substantial justice.

### IV.  <u>Conclusions and Order</u>

For the reasons explained in § II, above, Plaintiff's Motion to Strike the Declaration of Christos Stavropoulos (Docket Entry No. 34) is **DENIED**.  After careful consideration of the totality of the circumstances, for the reasons explained in § III, above, the court concludes that personal jurisdiction did not exist over Olympiakos when this action was filed, and that the exercise of personal jurisdiction over Olympiakos would not be consistent with Constitutional requirements of due process.  Accordingly, KAE Olympiakos SFP's Motion to Vacate Default Judgment (Docket Entry No. 18), is **GRANTED.**

**SIGNED** at Houston, Texas, on this the 30th day of June, 2010.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE